**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IVETTE VARGAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10 C 7554 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| MICHAEL J. ASTRUE, ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff filed this suit pursuant to 42 U.S.C. § 405(g) for review of a final decision denying her application for disability insurance benefits. For the reasons set forth below, the Court affirms the Commissioner's decision.

## Facts

From 1994 until October 23, 2008, plaintiff worked as a manager at various retail stores. (Administrative Record ["AR"] 125.)

On December 21, 2006, plaintiff had a defibrillator implanted in her chest to control a heart rhythm disorder know as Brugada Syndrome. (AR 170.) In May 2008, the lead on her defibrillator was changed, in June 2008, the lead was repositioned and, in July 2008, the entire defibrillator was repositioned. (AR 171-80.)

On August 27, 2008, plaintiff applied for disability insurance benefits. (AR 100.)

On October 18, 2008, plaintiff was evaluated by a consulting psychiatrist selected by defendant, who said plaintiff had Attention Deficit Hyperactivity Disorder ("ADHD") and depression. (AR 240-44.)

On October 20, 2008, plaintiff was examined by a consulting internist selected by defendant, who noted that, in addition to Brugada Syndrome, she had a history of asthma, ulcer disease, low back pain due to ruptured discs, a broken wrist and decreased sensation in one foot due to an injury. (AR 249-52.)

On October 23, 2008, plaintiff was fired from her job as manager of a retail store. (AR 133.) The same day she saw a physician for breast pain, complained of anxiety and was prescribed an anti-anxiety medication. (AR 302.)

Sometime thereafter, plaintiff submitted a function report to defendant in support of her application for benefits. It says she: (1) "can't handle stress," has "a lot of anxiety and panic" and cannot focus or concentrate; (2) cannot lift anything heavier than a gallon of milk or walk more than a block without needing a twenty-minute rest; and (3) can pay attention "[m]aybe 5 mins. if that." (AR 134-38.) However, it also says that she can drive a car, ride a bike, shop for "3-4 hrs. at a time," handle her bills and banking, care for her five-year-old son daily, work five days a week and "take[] part in outings, if [she is] motivated" to do so. (*Id.*) Moreover, it describes her daily activities as follows: "I wake up and get my son ready for school. I jump in the shower, get ready for work. I get off work[,] pick up my son and get us both ready for the next day. I may cook[,] sometimes watch movies, go over my son's homework and clean." (AR 133.)

On November 15, 2008, defendant's psychologist performed a psychiatric review of plaintiff's records and concluded that her mental conditions constituted a severe impairment that did not meet or equal a listed impairment and she "retain[ed] sufficient mental capacity to perform operations of a routine and simple nature on a sustained basis." (AR 272.)

In February 2009, one of plaintiff's doctors reported to defendant that her anxiety is stable on the anti-anxiety drug. (AR 294.)

On October 9, 2009, plaintiff had an initial consultation with a psychiatrist who said she suffered from post-traumatic stress disorder ("PTSD") related to childhood abuse and situational depression/anxiety but did not have "a convincing history of ADHD." (AR 334.) The doctor noted that plaintiff had a history of cocaine dependence and was currently taking an anti-anxiety drug that had been prescribed for her mother. (AR 334.) She recommended that plaintiff seek psychiatric treatment and counseling and be monitored for bipolar disorder. (AR 334.)

On November 2, 2009, Administrative Law Judge ("ALJ") Bassett held a hearing on plaintiff's application for benefits. During the hearing, plaintiff testified that she could not walk more than five blocks without taking a rest, experienced intermittent, sharp pains at the site of her defibrillator, was always tired, unmotivated and had difficulty concentrating. (AR 22-25.) A medical expert testified that "the only physical manifestation that [he] could actually attribute to the Brugada Syndrome . . . [is] the discomfort at the site of the [defibrillator]," such discomfort caused her doctor to restrict her lifting to ten pounds and her residual functional capacity was "light to medium." (AR 31-33.) A vocational expert testified that, even with the lifting restriction, there were unskilled "office type positions" like "a cashier or a general office clerk" that plaintiff could perform. (AR 36.)

On November 27, 2009, the ALJ issued a decision denying plaintiff's application for benefits. The ALJ found that plaintiff: (1) has a severe impairment of Brugada Syndrome and a nonsevere impairment of mood disorder; (2) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments; and (3) "has the residual

functional capacity "to perform the full range of sedentary work." (AR 47-48.) With respect to plaintiff's credibility, the ALJ said:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above stated residual functional capacity assessment.

(AR 50.)

## Discussion

The Court reviews the ALJ's decision *de novo* but gives deference to any factual findings. *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006). The decision will be upheld if it is supported by substantial evidence, *i.e.*, evidence "sufficient for a reasonable person to conclude that [it] supports the decision." *Id.* at 735 (quotation omitted).

Plaintiff argues that the ALJ erroneously concluded that her impairment of Brugada Syndrome does not meet a listing. Cardiac arrhythmias are a listed impairment if they are:

> Recurrent . . . [and] result[] in uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope or near syncope (see 4.00F3b), despite prescribed treatment . . . and [are] documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (see 4.00F3c).

(20 C.F.R. § 404, subpt. P, app. 1, 4.05.) For purposes of this listing, "recurrent" means that there are at least three, separate events in a consecutive twelve-month period, "uncontrolled" means the impairment does not respond to treatment and "near syncope" means a "period of altered consciousness," not just "a feeling of light-headedness, momentary weakness, or dizziness." (*Id.* 4.00A3c, 4.00A3f, 4.00 F3b.) Moreover, to meet the listing, "[t]he recurrent arrhythmia, not some

4

other cardiac or non-cardiac disorder, must be established as the cause" of "the syncope or near syncope." (*Id.* 4.00F3c.) The ALJ found that plaintiff does not meet this listing because her condition is successfully being treated with a defibrillator. (AR 48.)

Plaintiff does not dispute that her heart condition is being treated successfully but contends that the ALJ's analysis failed to account for the psychological effects of the condition, as directed by listing:

> 4. What will we consider when you have an implanted cardiac defibrillator and you do not have arrhythmias that meet the requirements of 4.05?
>
> a. Implanted cardiac defibrillators are used to prevent sudden cardiac death in individuals who have had, or are at high risk for, cardiac arrest from life-threatening ventricular arrhythmias. . . . The shock from the implanted cardiac defibrillator is a unique form of treatment; it rescues an individual from what may have been cardiac arrest. However, as a consequence of the shock(s), individuals may experience psychological distress, which we may evaluate under the mental disorders listings in 12.00ff.

(20 C.F.R. § 404, subpt. P, app. 1, 4.00F4a.)

There is no evidence, however, that plaintiff ever received any shocks from her defibrillator, the only distress-inducing event to which this section applies. (*See* AR 211, 216 (June 10, and July 1, 2008 medical records showing no shocks); AR 178 (May 28, 2008 medical record stating that plaintiff "has not had any defibrillator discharges"); AR 208 (May 13, 2008 medical record stating that plaintiff denies syncope and finding that no shocks had occurred); AR 205-06 (September 13, and November 21, 2007 medical records stating that plaintiff denies syncope and defibrillator shocks).) Given the evidence, the ALJ's failure to consider 4.00F4a was not erroneous.

Alternatively, plaintiff argues that the ALJ failed to consider whether the combination of her impairments, Brugada Syndrome and anxiety, depression, ADHD, PTSD, lower back pain, wrist pain, asthma, chest pain, and nerve damage equals a listing. The only disabling impairments

5

plaintiff listed in her benefits application and testified about at the hearing are Brugada syndrome, chest pain at the defibrillator site, depression and ADHD, all of which the ALJ considered. (AR 22-25, 47-50, 123.) Moreover, though plaintiff did not claim that the other conditions were disabling, the record shows that the ALJ considered them in making his determination. (*See* AR 50 ("[T]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision. . . . . [t]he restrictions indicated by the claimant's treating physician and the Medical Expert are consistent with those determined in this decision."); AR 30-33 (medical expert's hearing testimony about plaintiff's other conditions); AR 250-52 (consulting internist's report stating that plaintiff's: (1) wrist pain was an artifact of an old fracture and did not impair her ability to use the hand; (2) chest pain and shortness of breath were triggered by asthma, which had been diagnosed in 1998, was being treated with medication and had never caused her to be hospitalized or seek emergency medical care; and (3) back pain and nerve damage in one foot were due to injuries she sustained in 2002 and 2001, respectively).) Thus, the record establishes that the ALJ fulfilled his duty to investigate claims "presented at the time of the application or offered at the hearing as a basis for disability." *See Christner v. Astrue*, 498 F.3d 790, 792-93 (8th Cir. 2007).

Next, plaintiff argues that the ALJ erroneously found that her mental impairment is not severe. According to the regulations, a mental impairment that imposes a mild limitation in the functional areas of daily living activities, social functioning, and concentration, persistence or pace and causes no extended episodes of decompensation is nonsevere. 20 C.F.R. § 404.1520a(d)(1), (2). An impairment that imposes any greater limitation in any one the areas is severe. *Id.* The psychologist who performed plaintiff's psychiatric review concluded that she was moderately

6

limited in the functional area of concentration, persistence or pace and thus, had a severe impairment. (AR 270-72.) Because there is no contrary evidence on this point, the ALJ erred in concluding plaintiff's impairment was nonsevere.

The record shows, however, that the error was harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error analysis to a social security appeal). According to the regulations, an impairment that is severe must be analyzed to determine whether it meets or equals a listed impairment. 20 C.F.R. § 404.1520a(d)(2). The listing for organic mental disorders requires that: (1) the claimant have a loss of cognitive ability or affect change and documented persistence of (a) disorientation, (b) memory impairment, (c) perception or thought disturbance, (d) personality change, (e) mood disturbance, (f) emotional lability and impaired impulse control or (g) loss of measured intellectual ability; and (2) the loss or change causes a marked restriction in two of the four functional areas. 20 C.F.R. § 404, subpt. P, app. 1, 12.02. To meet the listing for affective disorders, the claimant must have documented persistence of: (1) depressive syndrome with four of the following – anhedonia, appetite disturbance and weight change, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, or hallucinations, delusions or paranoid thinking; (2) manic syndrome with three of the following – hyperactivity, pressure of speech, flight of ideas, inflated self-esteem, decreased sleep, easy distractibility, involvement in high-risk activities without awareness of consequences, or hallucinations, delusions or paranoid thinking; or (3) bipolar syndrome with a history of both manic and depressive episodes; and (4) the applicable syndrome must result in marked restriction in two of the four functional areas. 20 C.F.R. § 404, subpt. P, app. 1, 12.04. The agency psychologist performed the required analysis

7

and noted: (1) in January 2007, a non-psychiatrist physician prescribed anti-anxiety medication for plaintiff; (2) in October 2008, plaintiff told the consulting psychiatrist that she had ADHD, is forgetful and has trouble concentrating but had never seen a mental health professional and was not then on psychotropic medication; (4) the consulting psychiatrist gave plaintiff a Global Assessment of Functioning ("GAF") score of 45 but found no evidence of a thought disorder, flight of ideas, paranoia, phobias or hallucinations, found her to be fully oriented with appropriate mood and affect and that her memory, abstract thinking and judgment were intact; and (5) that there was a marked contrast between plaintiff's description of the severity of her symptoms and the wide range of activities she performed daily. (AR 272.) The psychologist concluded:

> Careful consideration has been given to the claimant's statements regarding alleged symptoms and their effect on functioning. Symptoms are attributable to the [medically determinable impairment] in nature but not in severity. Subjective [symptoms] are disproportionate to the objective medical findings and therefore, claimant is assessed as partially credible. On MSE, she exhibited intact memory, attention and concentration. She describes a general and full range of daily activities while at the same time indicating that she cannot pay attention for more than 5 minutes. She was coherent and able to relate history at the [evaluations] despite some difficulty focusing during the teleclaim and reports of "hearing things backwards." She has not been involved in mental health treatment and it would appear she only recently started on medication after having been on medication in 1/07. The claimant has a severe mental impairment that does not meet/equal the listings. She retains sufficient mental capacity to perform operations of routine and simple nature on a sustained basis.

(AR 272.)

After reaching this conclusion, and in accordance with the regulations, the psychologist then assessed plaintiff's mental residual functional capacity. *See* 20 C.F.R. § 404.1520a(d)(3) ("If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity."). The psychologist assessed the extent to which plaintiff's capacity to engage in twenty activities involving four areas of mental

functioning – understanding and memory, sustained concentration and persistence, social interaction and adaption – was limited by her impairments.. (AR 274-75.) The psychologist found that plaintiff was not significantly limited in her ability to:

> (1) remember locations and work-like procedures;
> (2) understand and remember very short and simple instructions;
> (3) understand and remember detailed instructions;
> (4) carry out very short and simple instructions;
> (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
> (6) sustain an ordinary routine without special supervision;
> (7) to work in coordination with or proximity to others without being distracted by them;
> (8) make simple work-related decisions;
> (9) complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
> (10) interact appropriately with the general public;
> (11) ask simple questions or request assistance;
> (12) accept instructions and respond appropriately to criticism from supervisors;
> (13) get along with coworkers without distracting them or exhibiting behavioral extremes;
> (14) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;
> (15) be aware of normal hazards and take appropriate precautions;
> (16) travel in unfamiliar places or use public transportation; and
> (17) set realistic goals or make plans independently of others,

and was moderately limited in the ability to:

> (18) carry out detailed instructions,
> (19) maintain attention and concentration for extended periods; and
> (20) respond appropriately to changes in the work setting.

(AR 274-75.) Thus, the psychologist concluded:

> The claimant retains the mental capacity to concentrate on, understand, and remember both simple, routine and more detailed instructions. Her ability to carry out tasks with adequate persistence and pace would be moderately impaired but adequate for completion of routine, repetitive tasks. She is able to follow and sustain an ordinary routine without special supervision and make simple work related decisions. Her ability to interact with and get along with the general public,

9

coworkers and supervisors is not significantly impaired. The claimant's ability to handle stress would be moderately reduced but adequate to tolerate the routine stressors of a routine, repetitive work setting.

(AR 276.)

The ALJ's decision cites the same evidence (*see* AR 47-50) and reaches the same conclusion, that "claimant's medically determinable mental impairment of mood disorder does not cause more than minimal limitation in [her] ability to perform basic mental work activities." (AR 47.) Because the ALJ reached the same, evidence-supported conclusion as the psychologist, his failure to deem plaintiff's mental impairment severe is harmless error.

Plaintiff also contends that the ALJ incorrectly concluded that "[t]here was no evidence of the use of medications designed to treat depression or other mental symptoms." (AR 50.) It is not clear, however, whether the ALJ meant plaintiff had never taken psychotropic medication or was not taking any at the time. If it is the latter, the statement is fully supported by plaintiff's testimony at the hearing that she was only taking medication for asthma. (AR 26.) If it is the former, the ALJ erred. (*See* AR 259 (October 23, 2008 medical record showing prescription for anti-anxiety drug); AR 294 (February 2009 doctor's report that plaintiff's anxiety was stable on the drug); AR 322 (March 5, 2009 emergency room notes stating that plaintiff takes anti-anxiety medication "as needed"); AR 334 (October 9, 2009 psychiatrist's note that plaintiff was taking an anti-anxiety drug prescribed for her mother).) Any such error is harmless, however, because the evidence shows that plaintiff's anxiety could be controlled by medication and therefore, is not disabling. *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2005).

Plaintiff also contends that the ALJ ignored evidence that she sought mental health care in 2009. The Court disagrees. The record shows that the ALJ knew plaintiff had started psychiatric

treatment a month before the hearing. (AR 14-15.) However, the only evidence of it the ALJ received were notes from a consultation plaintiff had with a psychiatrist who did not treat her but referred her to others for treatment. (AR 344.) Thus, contrary to plaintiff's contention, there was no substantive evidence of psychiatric treatment for the ALJ to consider.

The ALJ was also aware of, indeed mentioned, plaintiff's GAF score. (AR 48.) But the score does not control the disability determination. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Moreover, given the substantial evidence that plaintiff's mental functions are intact, (much of it, ironically, from the doctor who assessed the GAF), the ALJ's decision to accord little weight to the GAF score is not erroneous.

Finally, plaintiff challenges the ALJ's credibility finding, which the Court will overturn only if it is "patently wrong." *Prochaska*, 454 F.3d at 738. Credibility determinations are governed by SSR 96-7p, which requires the ALJ to evaluate, in light of all of the evidence, "the intensity, persistence and functionally limiting effects" of plaintiff's symptoms and the extent to which they affect her ability to work. Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7p, 1996 WL 374186, at *1-2 (S.S.A. July 2, 1996). The record shows that the ALJ did so and concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms" were not credible given: (1) the wide range of activities in which she reportedly engages; (2) her medical records, which show successful treatment for Brugada Syndrome and no treatment for any mental condition; and (3) their inconsistency with the consulting physicians' reports and opinions about her abilities. (AR 50.) Because the ALJ's credibility analysis is not patently wrong, the Court has no basis for overturning it.

## Conclusion

For the reasons set forth above, the Court affirms the Commissioner's final decision denying plaintiff's application for benefits. Therefore, the Court denies plaintiff's motion for summary judgment [14] and terminates this case.

**SO ORDERED.**                                **ENTERED: March 30, 2012**

								 _____
								 **HON. RONALD A. GUZMAN**
								 **United States District Judge**